GEORGE F. HARDING

v.

ADELAIDE M. HARDING.

*Opinion filed June 17, 1899—Rehearing denied October 5, 1899.*

1. EQUITY PRACTICE—*referring cause to master is discretionary.* The chancellor, under section 39 of the Chancery act, (Rev. Stat. 1874, p. 202,) may refer a cause to the master to take proof and report, and his discretion in so doing, being judicial, will not be interfered with on appeal, in absence of apparent abuse thereof.

2. SAME—*right of master to permit extensive examination as to defendant's property in alimony reference.* In acting under an order of reference as to allowance of alimony in a separate maintenance case, the master may permit a particular and thorough examination into the extent and character of defendant's property, particularly where there is a wide difference between the parties as to the value and condition of the property and the income therefrom.

3. SAME—*master's action in extending time without order of court may be waived.* The master's action in voluntarily prolonging the hearing of evidence greatly in excess of the time allowed by the order of reference may be waived by the conduct of the party seeking to complain of such action on appeal, particularly where the time fixed was entirely too short to permit proper hearing of the cause.

4. SAME—*when court may refuse to require master to report without conclusions.* The court may refuse to require the master to report the evidence without his conclusions, even though the time fixed by the order of reference for filing the report has long since passed, where the party making the motion has by his conduct acquiesced in the master's delay, and made no complaint until he discovered that the report would not be satisfactory to him.

5. SAME—*court may receive master's report though not filed within time fixed by order.* The court may, in its discretion, receive and consider a master's report although he has not conformed to the time fixed by the order of reference for filing the same.

6. SEPARATE MAINTENANCE—*when court is not precluded from consideration of matters because of stipulation.* A stipulation by defendant in a separate maintenance suit that complainant was living apart from him without her fault, and that she might take a decree for a reasonable amount for separate maintenance, does not remove from the consideration of the court the question of the defendant's misconduct and all other questions except the amount of alimony to be allowed, where the matter of the custody of the children and the right to suit money and solicitors' fees are contested issues.

7. SAME—*circumstances for consideration on question of alimony.* As incidental to the determination of the amount of alimony to be awarded in separate maintenance, the court, in addition to the matter of the property and income of the parties, may consider their ages, their health, past and present habits, social condition and circumstances in life and the misconduct of the defendant.

8. SAME—*amount of alimony is determined as in case of divorce.* The amount of alimony to be allowed in a separate maintenance suit is to be determined in the same manner as in case of divorce.

9. SAME—*right of wife to allowance for support of children without an order of custody.* Where complainant in separate maintenance asks for the custody of her daughters, which application is resisted by defendant and the question is reserved by the court until the final hearing, it is proper for the court, on entering a final decree awarding the custody to complainant, to make an allowance to her for the support of the daughters during the period of litigation.

10. SAME—*alimony—critical condition of husband's business affairs as an element.* The embarrassed and critical condition of the husband's business affairs is an element important to both parties in determination of alimony in separate maintenance, as the wife, though living apart, retains a wife's legal rights and interests, present and prospective, in the property.

11. APPEALS AND ERRORS—*chancellor presumed to have ignored incompetent evidence.* A decree will not be reversed because of the admission of incompetent evidence if there is sufficient competent evidence to sustain it, as it is presumed the chancellor ignored incompetent evidence.

12. The court affirms the allowance to complainant in this case of $8000 for solicitors' fees and of certain amounts for suit money and past support of children, but reduces the allowance for alimony from $6400 to $3600 per annum until further order of the court, as not warranted by the present value and net income-producing capacity of defendant's property.

(MAGRUDER, J., dissents as to reduction of alimony.)

*Harding* v. *Harding,* 79 Ill. App. 590, affirmed in part.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

WILLIAM J. AMMEN, for appellant.

PECK, MILLER & STARR, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The statement of the cause prepared by Mr. Presiding Justice WINDES, of the Appellate Court, is as follows:

"February 3, 1890, appellee filed her bill for separate maintenance against appellant, charging that in October, 1888, he began toward her a systematic course of unkind, abusive and cruel treatment, giving the details thereof, which increased until February 1, 1890, when, by reason thereof, she left their home and has ever since lived separate and apart from him without her fault; on information and belief, that appellant was worth, over and above all his debts, two or three million dollars, (stating, generally, the character and location of the property,) with a gross income exceeding $120,000 a year and a net income not less than $75,000 to $100,000 per annum; that of their seven children, three sons and a daughter were of age, and three daughters, Beatrice, Susan and Madeline, were minors, aged, respectively, sixteen, fifteen and eleven years; that Susan and Madeline prefer to live with appellee, are of tender age and require a mother's care; that appellant has of late years given but little of his companionship to his daughters, and is unable to give them that constant care, counsel, direction and oversight which young girls growing into womanhood require; that their best interests will be conserved by placing them in the custody of appellee; that Beatrice should be allowed to choose for herself whether she will live with appellee or appellant; that the family had for many years resided in a commodious house on Indiana avenue, Chicago, for a number of years had spent their summers on the Atlantic seacoast, and on four different occasions had the pleasures and advantages of foreign residence and travel, remaining in Europe each time from several months to a year or more; and on information and belief, that the expenses of the home and family had not been less than $15,000 a year for several years preceding October, 1888, when their

first trouble began.    The bill prays for separate mainte-
nance and suit money, the custody of Susan and Madeline,
an allowance for their support, maintenance and educa-
tion, and for general relief.

"Appellant answered at great length, denying the cause
for separate maintenance, but admitting that he supplied
appellee and his family liberally, and their manner of
life at home and abroad, giving details, and that he had
a large fortune, but denying that it amounted to two or
three million dollars or more; that his gross income has
never exceeded $95,000 in any one year and that his net in-
come exceeded $15,000 a year; also denying that his home
and family expenses have exceeded $9000 per year, on an
average, for the last ten years; alleging that his admitted
indebtedness exceeds $550,000, and that there were liti-
gated claims against him of not less than $200,000; also
that appellee had in secret ways acquired a handsome
fortune, without his suspicion or knowledge, from moneys
given her for household expenses by him but which she
failed to expend for that purpose; that she is seeking
by means of the bill, with its absurd charges, to increase
her already large fortune, and that the true cause of the
family trouble was because appellee assumed to credit
alleged information of his infidelity, and sought to com-
pel him to divide his property with her, giving details
of her acts and proceedings to that end and appellant's
efforts to protect himself and to check her action in that
respect; also, that on learning of appellee's leaving, he
sent repeated and urgent invitations to her to return,
and that if appellee persists in remaining away he will
insist on the custody of his minor children.

"By amendment, filed May 2, 1890, appellee alleges
that appellant had been guilty of adultery with Mrs. A. R.
Louis or VonLouis, and that knowledge of such adultery
first came to appellee in August and September, 1888, and
also makes charges of adultery of appellant with Mrs.
Lathrop and divers persons unknown.

"May 7, 1890, appellant filed an amendment to his answer, denying every allegation of the amendment, and reiterating the charge that appellee was trying to compel him to divide with her his fortune, and that was the cause of the entire difference between them.

"May 8, 1890, the cause was referred to Master Boyesen to take proof and report the same to the court. June 3, 1890, appellee filed her petition for temporary alimony for support of herself and two minor children, Susan and Madeline, for the custody of said children, for suit money and solicitors' fees. Appellant asked a postponement of the application for the custody of the children, and for a bill of particulars as to the charges in the amendment to the bill. In the meantime, the depositions of several witnesses had been taken and filed and the testimony of appellant taken in part before the master, on which hearing appellant declined to answer numerous questions as to his knowledge of relations to and associations with said Mrs. A. R. Louis, for the reasons, among others, that such answers might tend to subject him to disgrace, punishment, penalty or forfeiture, and to forfeiture of dower. The court denied the motion of appellee to compel appellant to answer said questions, and ordered appellee to file a bill of particulars as to the charges of adultery, which she filed, giving numerous times in the years 1885, 1886, 1887, 1888 and 1889, and numerous places in Chicago, Rockford and Lake Villa, Illinois, in the States of Arkansas, Missouri, Mississippi, Louisiana, Massachusetts and Wisconsin, and in France, Germany, Austria, Switzerland, and other places in Europe not particularly named, when and at which appellant committed adultery with Mrs. A. R. Louis, and also stating that 'at divers times in the years 1876, 1877 and 1878' in Chicago, in a house occupied by a lady (naming her) as a dwelling, and 'at other places in said city,' he committed adultery with said lady. Long after this order appellant offered to an-

swer the questions as to Mrs. Louis, but his offer not being accepted he did not answer them.

"July 1, 1890, the chancellor made an order for temporary alimony of $900 for the support of appellee and the two minor children to that date, and $300 per month thereafter, $1000 solicitors' fees and $400 suit money for appellee, and $180 per month, commencing July 1, 1890, for the support of Susan and Madeline, until the further order of the court, but reserved the question as to the custody of the children for further consideration. From this order appellant appealed, and after its reversal by this court the order was affirmed October 31, 1892, by the Supreme Court, except as to the allowance of $180 per month for said minors. (144 Ill. 588.) The court allowed appellee the sum of $300 to enable her to defend the appeal prosecuted from the order for her temporary alimony, from which allowance appellant also perfected an appeal to this court. This order was affirmed by this court.

"From time to time during the fall of 1890 and the spring and summer of 1891, to June 20, numerous depositions were taken before the master, and, on notice before commissioners on behalf of appellant, in different parts of the United States and in Europe, and appellee amended her bill by changing the date of her separation from appellant from February 3 to February 1, 1890. This amendment was made the occasion of a general and special demurrer to the bill as amended, and a hearing before the court thereon, notwithstanding his previous full answers thereto. During this period, also, divers motions and proceedings were had before the court, among which were an order allowing appellee $900 for the purpose of taking depositions in Europe, from which appellant perfected an appeal to this court, which was subsequently affirmed, and an order, on appellant's petition, changing the venue from Judges Tuley and Horton

of the circuit court of Cook county, and transferring the cause to Judge Collins.

"June 20, 1891, on appellant's motion, the reference was changed to Master Bass of the said circuit court; and thereafter a great amount of testimony was taken before the master, as well as depositions at different places in the United States and Europe, on behalf of both parties, and divers motions and proceedings made and taken before the chancellor, all during 1891 and early in 1892, and by agreement of the parties on February 11, the issues having been made, the cause was set for hearing March 15, 1892, but was not then heard. Why, does not appear. In May, 1892, appellee filed a supplemental petition for alimony, suit money and solicitors' fees, pending appeal on the original order in the Supreme Court, but no action of the court thereon appears to have been taken, beyond a suggestion by Judge Collins to the parties to settle up between themselves. Thereafter, from time to time, up to January 2, 1893, negotiations for settlement were pending between the parties but no results reached, and in the meantime, on October 30, 1892, the decision of the Supreme Court above referred to was rendered.

"January 3, 1893, the cause, having theretofore been set for trial, came on for final hearing before Judge Collins, when appellant read to the court and filed the following stipulation, viz.:

" 'STATE OF ILLINOIS, CIRCUIT COURT, COOK COUNTY.

Adelaide M. Harding  
        vs.          } Petition for Separate Maintenance.  
George F. Harding.

" 'When this suit for separate maintenance began, the plaintiff had in her hands a large sum of money and property, convertible into money and applicable to her support, received from me and from my family, and when this shall be expended and applied to her support, for which it was given her at that time, whatever the result of this case, it would be my duty, as I understand it, to give her further support, and this I should

do whatever the result of this case and without reference to whether she can exact it or not.

" 'I am confident of making good my defense if the case must be tried, but the considerations suggested make the fact that the plaintiff may prove to have no real cause of action, immaterial. Hence it seems to me to be wise, in the interest of my family and of peace, if I can put an end to this litigation to do so, by consenting to a decree giving her for separate maintenance such a sum as the court may find to be just and equitable, after due consideration of the evidence bearing upon the amount of the allowance. Hence I give my consent that a decree for separate maintenance shall be entered in favor of the plaintiff without a finding or trial of the issues in this case.

" 'That this consent is not collusive is sufficiently shown by the length and character of the litigation. I further offer and stand ready to make such other or further or different stipulation, as by an amendment of the pleadings or otherwise, as may in the opinion of your Honor be required to make it unnecessary for the court to hear and decide upon the issues and evidence in this case, after a long and expensive hearing. To this end I declare my willingness to stipulate, and I do hereby stipulate, that the plaintiff, at the time of the commencement of this suit, was living, and ever since has been living, separate and apart from her husband without her fault, and may take a decree, with my consent, for such sum as may be reasonable and just for her separate maintenance.

" 'This is the same offer which I have made by way of an attempt at a compromise ever since the commencement of this suit, at which efforts at compromise I have not hesitated to offer double the amount that in my opinion should be allowed for her separate maintenance by the court.

Wm. J. Ammen, *Solicitor for Deft.*          George F. Harding, *Pro se.*'

"Upon the filing of this stipulation, at request of appellee's counsel, and because of his surprise occasioned thereby, the hearing was postponed until the following day, when appellee, by her counsel, moved the court for a decreé of separate maintenance upon appellant's stipulation, but the chancellor stated that while appellee was entitled to a decree there would have to be a hearing as to the amount of the allowance to her, which would take but a short time, when one decree could be entered.

There being a difference between counsel for appellee and the chancellor as to the time necessary for a hearing as to the amount of alimony, counsel claiming a week was necessary and the chancellor saying he would give one day, no decree was entered and the further hearing postponed to a later day.

"January 5, 1893, appellee petitioned Judge Collins for, and was granted on January 14, a change of venue from him, but no judge was named to which the venue was changed, and immediately counsel for both parties went before Judge Clifford and asked for a hearing, but no action was taken, and on January 16, 1893, appellant, by his counsel, filed a written motion to set the case down for trial before Judge Clifford. The following day appellee served on appellant and filed in court what is termed her 'counter-statement or stipulation,' signed by her, in which is set out at length, among other things, an agreement reached between her and appellant in the negotiations for settlement as to alimony and maintenance, by .which appellant offered to pay her, and she was willing to accept, $6000 per annum, commencing June 1, 1892, and $1000 each for Susan and Madeline from same date, until they respectively arrived at the age of twenty-one years. This statement then proceeds, viz.:

"'But the failure to arrive at an entire compromise was because the defendant not only was unwilling to admit the fact that complainant was, at the time of the filing of the bill in this suit and thence hitherto, living separate and apart from defendant without her fault, or that a decree, except a decree approving such agreement as might be made and dismissing the suit, might be entered in the cause, but also because defendant insisted, during the first attempts at negotiation, that there should be a decree in this cause in his favor upon the issues herein, and that at the end of the negotiations, when it was supposed that the parties had arrived substantially at terms of settlement in other respects, he insisted that

nothing in the agreement that might be made or in the disposition of this cause should be a bar to his bringing a suit for divorce based upon the alleged cause of desertion by complainant, when, on account of defendant's misconduct, complainant, without fault on her part, departed from defendant and brought this suit. The voluntary stipulation by defendant filed herein removes the principal elements of difference on account of which the attempted settlement between the parties to this cause failed. Although complainant insists, and always has insisted, that the amount offered by defendant is less than one-half of what defendant is able to pay and what is necessary and suitable to the condition in life of the parties and what the defendant should be decreed to pay, still complainant says that for the sake of now promptly securing family peace, which has been disturbed by the litigation made necessary by the course of defendant, and now promptly securing an end of this litigation, and for the sake of prompt payment of said amounts so offered at the times provided therefor, without further litigation thereon, she is willing, upon a decree finding that complainant was living separate and apart from defendant without fault on her part being now promptly entered, such as the said voluntary stipulation of defendant justifies, to have the amount of her allowance now promptly fixed by decree at the amount which the defendant has offered as aforesaid. Inasmuch as the amounts of the payments to the two daughters, which were included in the terms of said proposed settlement offered by defendant, could only be provided for herein by decree allowing the same to complainant, the allowance to complainant in the decree should be $8000 per annum, to and including the twenty-first year of the elder of said daughters, then $7000 per annum to and including the twenty-first year of the younger of said daughters, and thereafter $6000, as provided in said proposed settlement offered by the defendant. That if defendant had, in such negotia-

tions as have heretofore occurred, admitted the fact that the complainant was living separate and apart from him without fault on her part, as is done in said voluntary stipulation, and offered that complainant might have a decree in this cause on that basis, this case would long ago have been settled and disposed of.'

"The court was unable to give a hearing by reason of its other engagements, and appellant not having paid appellee the temporary allowance made her pending his petition for a rehearing in the Supreme Court, she, on February 23, 1893, filed a second supplemental petition for alimony *pendente lite* and for the custody of the two minor children, but no action appears to have been taken thereon, and appellant's petition for a rehearing in the Supreme Court was denied March 13, 1893, and the order of the Supreme Court staying proceedings on the decree for temporary alimony was set aside.

"May 10, 1893, against the objection of the appellant, he expressing a desire to have the hearing before the court, an order of reference to Master Wait was entered, which was afterwards, on April 15, 1896, modified on motion of appellant, and entered *nunc pro tunc* as of the same day, which is, viz.: 'This cause coming on to be heard upon the motion to set the said cause down for hearing and to hear the same, it is ordered that this cause be and the same is referred to Horatio L. Wait, one of the masters in chancery of this court, to take evidence and report the same, with his conclusions herein, upon the issue in question as to the amount or amounts, if any, to be allowed complainant, and to be decreed to be paid by defendant to complainant, for alimony, support or otherwise herein, and upon other issues herein than the question as to whether the complainant, at the time of the commencement of this suit, was, and since that time has been and is, living separate and apart from her husband, the defendant, without her fault; said defendant having admitted upon the record herein, as by his written stipu-

lation filed herein on January 3, 1893, and for the purpose of this trial only, that the complainant was at the time of the commencement of this suit, and since that time has been and is, living separate and apart from her said husband without her fault. And it is further ordered, that upon said hearing all competent evidence heretofore taken in this cause may be read upon said hearing before the master and other competent evidence may be introduced by either party, and that the said master submit his report herein within fourteen days from and after this date, and that the respective parties have such portions of time, respectively, within said time so limited, for the introduction of evidence and argument as the said master shall prescribe. This order is entered *nunc pro tunc* as of May 10, 1893.'

. "The day following said order of reference the hearing before Master Wait commenced, and continued from day to day, with apparently great diligence, until June 2, 1893, when appellee rested. The same day appellant proceeded with the taking of his evidence, with apparently equal diligence, for the remainder of that month, but thereafter, during the remainder of the year and up to June, 1894, very little was done before the master, when the taking of evidence on the part of appellant was resumed and continued at intervals until July 31, 1894, when, although appellant did not announce that he had finished his evidence, no further proof was taken before the master after that date. During the remainder of 1894 and all of 1895 the time was consumed, so far as any attention was given to the case by either side, in the preparation of exhaustive briefs, which were submitted to the master, and in the hearing of objections before the master to a preliminary draft of his report.

"The final draft of the master's report was made under date of April 25, 1896, which shows that appellee's solicitors, in taking her evidence, consumed all the time specified in the order of reference within which the mas-

ter was to make his report; that this was repeatedly objected to by appellant; that in the opinion of the master such consumption of time in taking evidence of appellee was reasonable, and that appellant found it necessary thereafter to introduce evidence to support his side of the case, and also that the solicitors of the respective parties substantially acquiesced in the great increase in time fixed for the hearing. The master recommended that appellee be awarded the custody of her two daughters, Susan and Madeline, as of the date of filing the bill, and an allowance of $150 per month for each from that time to the respective dates when they attained full age, finding that they voluntarily resided with appellee and she had their actual care and custody during that period. He also recommended an allowance to appellee for her separate maintenance of $8000 per annum, but did not report upon the matter of suit money and solicitors' fees, being of opinion that they were not included in the order of reference.

"After the master's report was made but before it was filed in court, and pending the hearing of final objections thereto, (the original draft of report having been changed by the master after hearing arguments, on objections thereto,) appellant, under date of May 28, 1896, petitioned the court, complaining of the rulings of the master in admitting and considering great masses of alleged immaterial and irrelevant evidence, principally relating to appellant's conduct, thereby making large and unnecessary costs, and of his extension of the time in which to close proofs, and asking that the master be ordered to cease any further proceedings and return the evidence into court for a final hearing without the conclusions of the master.

"No hearing was had on this petition, and on July 17, 1896, appellant, among other things, moved the court to reduce the temporary allowance of alimony because of his claimed inability to pay, to suspend payment of ar-

rears of alimony, and to set the cause for hearing as to permanent alimony and all other issues in the case upon evidence to be offered in open court, and 'for such other orders and relief in the premises as the court may deem proper.' In support of these various motions, appellant at the same time filed a further petition, setting forth at great length the previous proceedings before the court and the different masters, complaining that the cause was referred to Master Wait, of his rulings, the expense of the reference, the delay made by the master; that the master was prejudiced against appellant and had totally disregarded the terms of the order of reference, and alleging that since the taking of the evidence in 1893 and 1894 great changes had taken place in his financial condition since the trial, which rendered it impossible for him to pay temporary alimony or the permanent alimony and allowances recommended by the master (setting forth the same in great detail); that appellee's solicitors have since May 10, 1893, when the reference was made, consumed that great length of time in an effort to increase their own fees and costs, and sought to have the prejudiced and interested master allow them enormous fees. This petition asks a reduction of the temporary alimony; relief against the payment of arrears of same; that the cause be set down for hearing at once upon proof to be offered in open court; that the master be ordered to report the evidence without his findings or conclusions thereon, and for general relief.

"On the date this last petition was filed the court entered an order based upon all the motions and petitions of the parties theretofore made, ordering the master to return forthwith into court his report of findings, and conclusions and objections thereto, reserving for the future consideration of the court all questions as to fees of the master and solicitors, and all other questions involved in the motions of appellee and in the cause, and setting the cause for final hearing on September 10, 1896, on the

report of the master and exceptions of the respective parties thereto, and on all other questions or issues in the case. Objections before the master to his report of both parties were ordered to stand as exceptions thereto. The hearing on the master's report was had the latter parts of September and October, 1896.

"October 22, 1896, appellee filed her petition, setting forth her different motions and petitions for alimony and solicitors' fees, the services of her solicitors, and the refusal of the master to pass on the question of solicitors' fees, and praying a reasonable allowance to be made her for her solicitors.

"January 22, 1897, appellant filed another petition, setting forth in detail his previous petitions filed in the cause and heretofore mentioned; the order of the court of July 17, 1896; the filing of the master's report and the evidence heard by him, and alleging that since the proof was closed before the master in July, 1894, the value of his property in the market has decreased at least thirty per cent, and in his opinion at least fifty per cent; that his estate was not worth in excess of $250,000 over his debts, and in his opinion it was not worth in excess of $100,000 above his debts; that his gross income in the same period had decreased at least twenty-five per cent, and in his opinion at least forty per cent; that his taxes had increased, as also expenditures for repairs and interest; also that he had no net income, and that, in substance, it would be utterly ruinous to him to fix allowances to appellee upon the basis of the testimony theretofore taken, setting forth numerous details as to his financial condition, the previous proceedings before the court and the master, the fortune of appellee in her own right, and praying a hearing before the court, upon evidence to be offered bearing on the then present condition of his affairs and indebtedness, upon the question of permanent alimony of appellee, the reduction of the temporary alimony and release from arrears thereof, and all other

questions remaining undetermined in the case. This latter petition was answered by appellee, in which issue was taken on its material allegations.

"Commencing January 22, 1897, there was a further hearing before the court upon all the petitions and motions herein above mentioned, and new evidence received upon such hearing in open court, which was completed February 5, 1897. The whole case was thereafter held under advisement by the chancellor until July 27, 1897, when a final decree was entered, finding that appellee, when her bill was filed, was then living, and ever since had lived, separate and apart from appellant, her husband, without her fault; overruling all exceptions to the master's report; finding that the conclusions of the master were correct, (among which was a finding by the master that all the material allegations of the bill were supported by the proof); finding that since the taking of the evidence before the master, and since the hearing of exceptions to his report, a change had taken place in the value of the property and circumstances of appellant, which required a reduction of the allowance fixed by the master, and fixing appellee's permanent alimony at $6400 per annum from and after July 26, 1897, until the further order of the court, without prejudice to the order of July 1, 1890, for temporary alimony; also finding that said Susan and Madeline Harding had been supported by appellee from the date of filing the bill until they respectively attained the age of eighteen years, and awarding appellee the sum of $100 per month for each of said daughters during said periods, in the aggregate $8156.61; also awarding to complainant, for her solicitors' fees, $8000, and for suit money paid or incurred by her, $996.47. The court further decreed that appellant pay the costs of the cause, and that the petition and motion of appellant to reduce or modify the order for temporary alimony be denied.

"From this decree this appeal is taken, and there is presented for the consideration of this court a record of

more than 7000 typewritten pages, with an abstract and supplemental abstract by appellee of 1845 printed pages, and briefs and arguments of 1350 pages."

We find it correct and sufficiently full. The opinion rendered by the Appellate Court, speaking through Mr. Presiding Justice WINDES, treats fully and satisfactorily all errors assigned by the appellant except that classified as No. 11 in the classification of assigned errors adopted in the opinion of the Appellate Court. The opinion, omitting what is said by that court as to error No. 11, is as follows:

"There are assigned on the record in this case by appellant one hundred and fourteen errors and thirty-four cross-errors by appellee. The needless repetitions, over and over again, by appellant's counsel, in his briefs and arguments, of his points and of the evidence which he claims sustains them, have caused us a great amount of unnecessary labor. The arguments, also, are largely made up of long quotations from the abstract, which is wholly unnecessary and of no assistance to the court.

"Appellant is particular to rely on each and all the errors assigned by him, but their substance, so far as they by any possibility merit a consideration, may be stated, viz.: The court erred, first, in not hearing the cause in open court, and summarily, and without referring it to the master; second, in not confining the evidence to a general view of appellant's property and income; third, in not compelling the master to obey the directions of the order of reference; fourth, in not ordering the master to report the evidence without his conclusions; fifth, in hearing the cause upon the master's report, exceptions thereto and evidence taken by the master; sixth, in receiving and considering the master's report after he had disregarded the terms of the order of reference; seventh, in denying the relief asked by appellant's petition of January 22, 1897, and his previous petitions; eighth, in decreeing that appellee was, at the filing of the bill, living, and ever

180—32

since had been living, separate and apart from appellant without her fault; ninth, in finding that the conclusions of the master (specifying the same) were correct; tenth, in hearing and considering immaterial, irrelevant and incompetent evidence; eleventh, in allowing appellee $6400 per annum as permanent alimony; twelfth, in finding that appellee supported Susan and Madeline from the filing of the bill until they respectively arrived at the age of eighteen years, and in awarding their custody to appellee; thirteenth, in making the allowance of $8156.61, or any allowance, to appellee for the support of said daughters; fourteenth, in making the allowance to appellee of $8000 solicitors' fees; fifteenth, in allowing appellee $996.47 for suit money; sixteenth, in decreeing that appellant pay the costs to be taxed; seventeenth, in not considering and giving due weight to appellee's separate fortune.

"In thus stating the different contentions of appellant we have not intended to omit any question of substance or possible merit raised by him, and if we have done so it must be attributed to the fault of his counsel in making his briefs and arguments so voluminous by assigning, repeating and arguing repeatedly numerous alleged errors of the court on matters which cannot be considered on appeal from the final decree only, but only on a writ of error, and which alleged errors had been waived by appellant, (as, for instance, the change of venue from Judge Collins,) that in the mass of material we have overlooked some meritorious matter.     3 Starr & Curtis' Stat. chap. 146, sec. 17; *Smith* v. *Brittenham,* 88 Ill. 291; *Freeman* v. *Freeman,* 66 id. 53. `

"As to appellant's first contention, the court, in referring the cause to the master to take proof and report the same with conclusions thereon, exercised the power given him by section 39 of chapter 22 of the statutes of this State. (1 Starr & Curtis, p. 587.) The discretion given the court by the statute is a judicial one, and we cannot hold, from anything appearing in this record, that there

was an abuse of it. *City of Belleville* v. *Citizens' Horse Railway Co.* 152 Ill. 171.

"*Second*—To enable the court to determine what allowance should be made to appellee for alimony, one of the paramount considerations was the nature and value of appellant's property and the amount of his income. We see no reason why this matter should not be as carefully and thoroughly investigated as any other question of fact upon which it may become necessary for a court to adjudicate. Appellant has cited no authority on this point, nor have we been able to find any which supports the contention. Appellant's property, as disclosed by the pleadings and evidence, consists largely of real estate, widely scattered; some of it in litigation, very much of it mortgaged; some city and town lots improved, others unimproved; some improved and profitable farming lands, and others not so well improved and bringing little or no income. This being so, and it appearing from the allegations of the pleadings that there was a very wide difference between the parties, both as to the value and condition of appellant's property and the income derived therefrom, we cannot say that there was any error in the chancellor permitting a particular and thorough investigation in that regard.

"*Third*—The order of reference, among other things, directs the master to submit his report within fourteen days from the date of the reference, and that the respective parties have such portions of time, respectively, within said time so limited, for the introduction of evidence and argument as the master shall prescribe. The master did not file his report until more than three years and four months had elapsed after the reference, nor was there any modification or extension given by the court, and his conduct cannot be excused unless the time limited was too short, or appellant is responsible for the delay or waived his rights under the terms of the order. Some or all of these considerations will excuse the master.

It should be noted that the order of reference provides that upon the hearing before the master 'all competent evidence heretofore taken in this cause may be read upon said hearing before the master.' The hearing before the master commenced the next day after the entry of the order of reference, at ten A. M., when appellee offered in evidence the testimony of E. R. Bowen, which had been theretofore taken in the case, and relating principally to the property and income of appellant. Appellant made objections to the testimony, the argument of which objections consumed that day and the following day. At the close of the argument the master decided to admit the testimony, whereupon appellant withdrew his objections without any explanation, so far as the record shows, for this great consumption of time. Thereafter appellee offered in evidence the depositions of numerous witnesses, all of which was competent and material to one or more of the issues referred to the master, the reading of which and the consideration of objections thereto consumed four days. Appellee then proceeded with new evidence, and among other testimony her own was taken with reference to the issues referred to the master, with some detail and particularity, the direct and re-direct examinations making 104 typewritten pages. Appellant's cross and re-cross examination of this witness, together with the exhibits offered in connection therewith, takes up 370 typewritten pages of the record. Appellant was also called to testify for appellee as to his property. His direct examination took 28 pages of the record, while he caused himself to be cross-examined to the extent of 182 pages of the record. In view of this course pursued by appellant we think he cannot complain that more time was consumed before the master than was given by the order of reference. Moreover, instead of going to the court for relief because of the master's disobedience of the order of reference, appellant, upon the same day appellee's proof was closed, commenced the taking of evi-

dence on his own behalf, and continued taking it from day to day, almost daily, for more than one month, and thereafter, from time to time, at intervals for thirteen months, and did not then formally announce that his evidence was closed. This, we think, was a waiver of the master's action in extending the time beyond the order. But if all this may not be considered a waiver, we think appellant's action, for almost two years following this taking of the last proof before the master; in failing to make complaint to the chancellor until he asked a report of the testimony without conclusions; in the preparation of a long brief which was submitted to the master upon the questions before him; in the argument of objections to the preliminary report of the master, and in asking that the master report the testimony without his conclusions, considered in connection with appellant's previous conduct, as above stated, is ample to constitute such a waiver. We also think that, considering the number of questions at issue, the amount and variety of appellant's property, the stubborn resistance of appellant at every step in the cause, and the number and variety of legal objections interposed by him and his counsel during the progress of the hearing before the master, the time fixed by the order of reference was entirely too short. No master and no court could properly hear the evidence and arguments of counsel, consider the same, and report intelligently thereon, in view of what is shown by this record, in the time fixed by the court's order.

"*Fourth*—If we are right in holding that the order of reference did not give sufficient time, and that appellant, by his conduct, waived the extension thereof by the master, then there was no error in refusing to order the master to report the evidence to the court without conclusions. And especially is this true when we consider that appellant made no complaint to the chancellor until after it was apparent to him that the report of the master would not be satisfactory to appellant.

"*Fifth*—This position is not tenable because it is not supported by the record. While it is true that the court did consider the master's report on exceptions thereto and the evidence heard by him, it also heard such further evidence as the parties saw fit to introduce as to all the issues involved, and although the chancellor found that the conclusions of the master, based upon the evidence before him, were correct on that evidence, he, notwithstanding, reduced the allowance to appellee recommended by the master $1600 per annum, and to appellee for the support of the two minor children $50 per month for each child, and it appears from the decree that these changes were made because of the change in the value of property and circumstances of appellant, after the taking of the evidence before the master.

"*Sixth*—As we have seen, there was sufficient reason to justify the master in extending the time for taking of evidence beyond the time fixed by the order of reference, and no doubt the chancellor so considered. It was a matter within the discretion of the court to receive and consider the master's report, although he had not conformed to the time fixed by the order. We see no error in this regard.

"*Seventh*—The relief asked by appellant's petition of January 22, 1897, and his previous petitions, was granted to the extent that the cause, as to the reduction of temporary alimony, what permanent alimony should be allowed, what allowance should be made for the support of the two minor children from the filing of the bill, and the determination of all other questions and issues in the cause remaining undetermined, was set down for hearing upon evidence to be introduced by the parties as to the then condition and value of appellant's property and the then condition of his indebtedness and affairs. The substance of his previous petitions was included in his petition of January 22, 1897, which asked, practically, a rehearing of all the issues in the case, except whether appellee was

living separate and apart from appellant without her fault when the bill was filed, and so continued, upon evidence then to be heard. The court did not leave out of view the evidence theretofore taken, but gave appellant the opportunity to introduce all the additional evidence that he desired. We see no error in this action of the court; and as to the conclusions reached, they will be later considered.

"*Eighth*—The statement or stipulation of appellant, signed by himself and his counsel, presented and read in open court and filed as it was, and which states, among other things, viz., 'I do hereby stipulate that the plaintiff, at the time of the commencement of this suit, was living, and ever since has been living, separate and apart from her husband without her fault, and may take a decree with my consent for such sum as may be reasonable and just for her separate maintenance,' amply justifies the finding and decree of the court in so far as it relates to her living separate and apart from appellant without her fault. The argument of appellant that this stipulation, by reason of the circumstances under which it was presented and acted upon, constituted a contract between appellee, the court and appellant, which removed from the consideration of the court all questions in the case, direct as well as incidental, except the mere matter of amount of alimony to be paid to appellee, cannot be maintained. The question of custody and support of the two minor children had all along been a distinct and contested issue. The matter of suit money and solicitors' fees, which are allowable under the statute in every suit for separate maintenance, was also made an issue by the pleadings. Neither of these questions was removed or in any degree affected by the stipulation. As incidental to the determination of the amount of alimony to be awarded appellee, there remained to be considered, besides the property and income of appellant and appellee, their ages, health, past and present habits, social con-

dition and circumstances in life, and the misconduct of appellant. This point will be more fully considered under the tenth division.

"*Ninth*—We deem it unnecessary to consider in detail, under a separate heading, all the conclusions of the master, inasmuch as they are referred to in other parts of this opinion, in so far as we think they would receive any special mention. Except as specially mentioned, a full consideration by us of the evidence before the master has caused us to conclude that his findings are sustained by the weight of the evidence, and the chancellor did not err in sustaining the master in his conclusions upon the evidence heard in 1894, and prior thereto. Appellant has severely criticized the master for stating in his report, as he did, that the main issue in the cause is whether appellee was entitled to have a decree awarding her a separate maintenance, and in proceeding to make a finding on that issue, although that issue was not referred to the master. We are unable to understand this statement and finding of the master in view of the order of reference, but it is unimportant, because the issue in this regard was admitted by appellant's stipulation of January 3, 1893. Also, we are unable to understand why the master should report and the court should affirm his finding that all the material allegations of the bill are supported by the proofs, so far as they were referred, when it is alleged that appellant committed adultery with a lady not Mrs. Louis, (naming her,) when no evidence was introduced on that point. It must have been an oversight of the master and the court; and, moreover, it is not important, because the court has certified the adultery charges were not considered by him.

"*Tenth*—That the master admitted incompetent evidence relating to charges of adultery made against appellant with Mrs. A. R. Louis must be conceded. This evidence was of conversations between several of the witnesses called by appellee and Mrs. A. R. Louis, out

of the presence of appellant, and so far removed in time and place from an alleged act of adultery that the conversations could not be considered a part of the *res gestœ*, and were therefore inadmissible under well established rules of evidence. There was, however, some evidence of this nature (that of Kate Coughlin, for instance,) admitted which came clearly within the rule making it competent as part of the *res gestœ*, and in which the witness detailed an occurrence at Masury flats, and stated that she saw appellant walk out of the room then occupied by Mrs. Louis, and when he walked out Mrs. Louis said to witness, 'That is uncle,' referring to appellant. *Springfield Railway Co.* v. *Hoeffner*, 175 Ill. 634.

"In so far as evidence was competent which related to appellant's adultery charged in the amended bill, or to his cruelty as charged in the original bill, it was also material and relevant, both on the question of the custody of the two minor children and on the amount of alimony to be awarded appellee, the contention of appellant to the contrary notwithstanding, that no evidence on these matters was either relevant or material because it was eliminated by the stipulation of appellant. (Hurd's Stat. chap. 68, sec. 22; 2 Nelson on Divorce and Sep. sec. 902; 2 Bishop on Marriage and Divorce, sec. 1009; *Stewartson* v. *Stewartson*, 15 Ill. 145; *Bergen* v. *Bergen*, 22 id. 187; *Mussing* v. *Mussing*, 104 id. 126; *Johnson* v. *Johnson*, 125 id. 510.) Our statute, *supra*, provides that the court, in fixing the amount of alimony in separate maintenance cases, shall, among other things, consider 'the circumstances of the respective cases.' The Divorce act has a similar provision, providing that the court shall make such order 'as from the circumstances of the parties and the nature of the case shall be fit, reasonable and just.' In the *Stewartson case, supra*, which was divorce, the Supreme Court said: 'The conduct of the parties may very properly be taken into consideration upon the question of alimony. * * * In cases where the circumstances may justify

a divorce under our statute there may be widely different degrees of merit on the one side and censure on the other, which would very properly be considered in determining the question of alimony, quite independent of the pecuniary circumstances of the parties.' In the *Mussing case, supra,* it was held that the husband's cruelty was properly considered in fixing the amount of alimony. In *Harding* v. *Harding,* 144 Ill. 588, it was held that the amount of alimony in a separate maintenance suit is arrived at in the same manner as in divorce cases. In the *Johnson case, supra,* which was separate maintenance, it was held that, among other things, in fixing the amount of alimony, it was proper to consider 'the circumstances of the case,' among which was the husband's cruelty and his repeated charges that his wife was unchaste.

"As we have held the question as to the custody of the minor children was not eliminated by the stipulation, it follows that all competent evidence on the question of adultery was also relevant and material on that issue. It is not argued that the master improperly admitted any other evidence. The chancellor is presumed to have ignored all incompetent evidence, and there is sufficient competent evidence in the record to sustain the decree. This being so, there should not be a reversal because of the incompetent evidence. *Dunn* v. *Berkshire,* 175 Ill. 243.

"*Twelfth*—The evidence is nowhere disputed that Susan and Madeline voluntarily went with appellee when she separated from appellant, nor is it disputed that they were supported and maintained by appellee from the time the bill was filed until said daughters, respectively, arrived at the age of eighteen years. What has been and is hereafter said with reference to appellant's conduct as it relates to his cruelty to appellee, his conduct towards his children, the ages and needs of the daughters, is a sufficient reason why appellant should not have the care and custody of his daughters as against appellee, and would have justified the court, at the date of filing the

bill, in awarding their custody to appellee if she were a fit person,—and that is not, and cannot under this record, be seriously questioned. The difficulty presented is in the fact that no order as to their custody was made, but the question was reserved by the court. Appellee asked their custody by her bill and in repeated applications thereafter renewed it. The appellant resisted, and the court did not decide until the final hearing. It seems to us there can be no valid or legal objection to the doing on the final hearing what it might have done when the bill was filed, had the evidence to justify its decree then been before the court.

"*Thirteenth*—The evidence, in our opinion, bearing upon the manner of life of the Harding family prior to the separation of appellant and appellee, the social position of the family and the ages and needs of the daughters, and the ability of appellant to pay, justified the finding of the chancellor as to the amount of the allowance made to appellee for their support and maintenance. A much more difficult question is presented as to whether any allowance could be made until after the court had awarded the custody of the daughters to appellee.

"In *Plaster* v. *Plaster*, 47 Ill. 290, by decree of divorce in favor of the wife the custody of her child by the husband was given her, but made no provision as to how the child should be maintained. It was held, on petition of the divorced wife, that the husband should be required to pay her for the child's support. The court says, in speaking of the parents' duty to support children: 'This duty devolves first upon the father and next upon the mother, so long as they are of tender years and unable to provide for themselves. * * * His (the father's) being adjudged by the court to be unfitted to have the custody, care and education of the child, did not, nor could it, release him from both his natural and legal duty. * * * Plaintiff in error (the divorced wife) owed him no duty

as a wife, and her duty to support the child continued, as before, secondary, and his primary.'

"In *Rogers* v. *Rogers*, 51 Ill. App. 683, where the wife had been divorced from her husband without any provision as to the custody of a minor child, the court held that the husband was liable to his wife for the child's support by the wife subsequent to the divorce.

"In *Forest* v. *Forest*, 25 N. Y. 505, (518,) the wife was, on divorce, awarded alimony from the time her bill was filed, although pending the suit, which was not heard for several years after commencement, she had a temporary allowance. The court of appeals approved the decree. In *Burr* v. *Burr*, 10 Paige's Ch. 20, a similar practice was approved in a case of separation *a mensa et thoro*.

"In *Dooley* v. *Dooley*, 19 Ill. App. 391, the court held (BAKER, J., since of the Supreme Court, delivering the opinion,) in a suit for a divorce, that an allowance *pendente lite* for the past maintenance, at a domicile other than the husband's own, of the wife and children, was not improper, and affirmed it.

"In *Obrock* v. *Obrock*, 32 Ill. App. 149, a decree for separate maintenance of the wife in the past was affirmed. Also, in *Becker* v. *Becker*, 79 Ill. 532, a decree for divorce awarding children to the wife, and for her and their past maintenance as well as future, was affirmed.

"We do not understand that anything said by the court in *Harding* v. *Harding*, 144 Ill. 588, necessarily conflicts with the *Dooley* or *Becker cases, supra*. In the *Harding case* the trial court did not adjudicate on the question as to the custody of the children, and the Supreme Court held that it was improper to make an allowance to the wife for their support until their custody was awarded to her.

"In *Zilley* v. *Dunwiddie*, 74 N. W. Rep. 126, the Supreme Court of Wisconsin held that where a decree of divorce against the husband for cruelty awarded the custody of the children to the mother until the youngest child was ten years of age, but making no provision for their sup-

port, and the youngest child remained with the mother, by her solicitation, after he attained the age of ten years and was supported by her, though the father repeatedly requested the mother to allow him to take the child, he offering to educate it and give it a home with him, she refusing each time to give her consent, the father's estate was liable to the mother for the child's support. The learned Judge Pinney cites with approval the *Plaster case*, 47 Ill. *supra*, and says: 'The father is under legal obligations to provide for the support of his children if they remain with the mother after her divorce, and, as against the public and the children, he cannot escape the duty. * * * It was the right, and the duty as well, of the husband to obtain the custody and control of his infant son and to support him after he arrived at the age of ten years. We consider it against the policy of the law to encourage a father thus obligated to attempt to ignore or evade his parental duty or to cast it upon any other party, so as to enable him to convert such parental neglect and misconduct into a shield against parental liability. Domestic and social duty alike require him, when his son arrived at the age of ten years, to enforce his parental rights and to discharge his parental duties.' To a like effect are *McGoon* v. *Irvin*, 1 Pin. (Wis.) 526; *Buck* v. *Buck*, 60 Ill. 107; *Plaster* v. *Plaster*, 67 id. 93; *Pretzinger case*, 45 Ohio St. 452; *Holt* v. *Holt*, 42 Ark. 497. In the two latter cases the *Plaster case*, 47 Ill. *supra*, is referred to with approval.

"If, as said in the *Plaster case*, the husband's liability to support the children was *primary* and that of the wife *secondary* when they had been divorced, that was also true at the common law, (2 Kent's Com. 190,) and is not changed because of the marriage relation. If appellant desired, in good faith, the custody of his daughters during all this long litigation, he could have applied for it at any time; but he saw fit to stand by and defend against appellee's application for their custody, and prevailed

upon the court to reserve its decision until the final hearing. If it was right,—and as we have seen in a number of instances the Supreme Court has so held,—to give a wife, on final decree in case of divorce or separate maintenance, an allowance for her past support and that of her minor children who resided with her pending the suit without an order awarding their custody until the final hearing, we are unable to see why it was not proper in this case, in which appellant is at fault and also resisted appellee's application for the custody of her children, for the court to award the custody of the two daughters to appellee and make her an allowance for their support. The court could do in this regard, on final hearing, what it could have done when appellee first asked the custody of her daughters, if it had then had the evidence before it to justify its decree.

"*Fourteenth*—The testimony as to solicitors' fees for the actual time spent by appellee's solicitors, and their clerks under their directions, in the taking of testimony before the master, in preparing for trial, and in court, at the rates testified to by appellant's witness Scovel as being reasonable and usual, would justify the decree of the court in this regard. Mr. Miller gave eighty days to the case, of which thirteen days was in court and the remainder before the master and in his office. Mr. Starr one hundred and two days, of which twenty days was in court and the remainder before the master and in his office. Their clerks gave one hundred and forty-seven days' time to the case, and it appears they were lawyers and experienced in the line of work which they did. Their (the clerks') work appears from the evidence to have been reasonably worth $10 per day. Mr. Scovel testified that reputable lawers in Chicago, for court work, received usually and ordinarily $75 to $100 per day, and for services in their offices, outside of court and before a master, $25 per day. The testimony on behalf of appellee would justify a much larger allowance for solicitors' fees than

was decreed. From the full consideration of all the testimony bearing on this question, together with the record as presented in this court, disclosing, as it does, a bitter and stubborn defense at every step in the cause; an examination as to values, income and encumbrances of numerous and widely separated pieces of real estate; of numerous facts bearing upon the lives, family history and method of life of the parties; the *delictum* of appellant as affecting the alimony of appellee and the custody of the children; the examination and preparation of the legal questions arising in the case for presentation to the master and the court, and the presentation of all these matters to the master and the chancellor, and judging the whole in the light of our own experience at the bar and on the bench, we are of opinion the allowance of $8000 for appellee's solicitors is justified and should stand.

"*Fifteenth*—The allowance of $996.47 for suit money is entirely justified by the evidence. It was mainly for services of stenographers employed by appellee and her solicitors in making copies of the testimony in the case, and in taking dictation on an abstract of the testimony for their use; also for fees for the master paid by appellee. A larger allowance might have been made under the evidence.

"*Sixteenth*—As to the costs, appellant has not specified any particular part of the costs which he claims should not have been taxed against him, but has been content with generally assailing the master and appellee's counsel for making large and unnecessary costs in the case. We cannot say that no costs should have been awarded against appellant, and without some specification in this regard we will not search through the record to determine the matter. We have not even been referred to any bill of costs against appellant.

"*Seventeenth*—The contention of the appellant that the court did not consider and give due weight to appellee's separate property is not sustained by the record. There

'is a large amount of testimony in different parts of the record relating to appellee's property. In one place sixteen pages of the abstract are taken up with appellant's testimony before the master concerning appellee's property, most of which he claimed she got from him. Appellee also testified fully regarding it, and that she had spent substantially all of it in the support of herself and children and in paying her expenses in this suit. The master did not report specifically on this point. Appellant, in his petition of January 22, 1897, asks that this matter be considered, and was given an opportunity to present evidence on this petition in open court, but the record fails to show that he availed himself of this privilege. The decree of the court in part allowed and in part denied appellant's petition, but there is nothing in the decree or in the record, which has been called to our attention, to show that the chancellor did not consider the testimony regarding appellee's separate property.

"In so far as appellee's counsel have argued the cross-errors, what has been said in our opinion sufficiently answers the several contentions of appellee in that respect. It is impossible, without writing for weeks, to discuss all the many contentions of appellant in this record, but having given the most careful consideration to every matter which to us seems to have any possible merit, we are of opinion that justice, as nearly as it can be attained, has been done, and the decree is affirmed."

The opinion of the Appellate Court as above quoted is adopted as the opinion of this court, except in so far as it declares the decree should be affirmed *in toto.* We are unable to assent the decree should be affirmed in so far as it awards appellee alimony in the sum of $6400, which is the subject matter of the assigned error No. 11 as the objections and assignments of error were grouped by the Appellate Court.

Section 1 of the act entitled "An act in relation to married women," (Hurd's Stat. 1897, p. 903,) provides that

a married woman who is living separate and apart from her husband without her fault may have her remedy in equity for reasonable support and maintenance, to be determined with reference to the condition of the parties in life at the place of residence of the husband and the circumstances of the respective cases.   At the January term, 1897, the said circuit court proceeded to hear and consider testimony to enable it to ascertain the facts necessary to be known in order to give operation to those provisions of the statute.   The taking of proof prior thereto was closed in July, 1894.   At the hearing in January, 1897, the appellant and George F. Harding, Jr., his son, were examined at great length with reference to the financial condition of the appellant, the value of his property, encumbrances thereon, the litigation in which he was involved affecting the title to a portion of the property, and other litigation against him to recover indebtedness as surety for others and upon his own account, as to the tax liens and claims against his property, the income therefrom and his outgoes.   This testimony had reference more particularly to his financial condition, value of his property and income therefrom, during the years following the closing of the taking of testimony in 1894 and up to and including the year 1896.   Aside from certain witnesses who gave testimony as to the prevailing general business and financial conditions, appellee introduced no testimony to enlighten the court as to the present value of the property or status of the affairs of appellant, or as to such condition of his property and affairs subsequent to 1890.   Appellee introduced for the consideration of the court the affidavits of appellant and one VanMeter, made June 14, 1890, which related to the estate of the appellant at that time.

It appeared the appellant is the owner of a great deal of city property in the city of Chicago.   Some of it was improved and income-producing to a greater or less extent and some of it vacant lots and acre property.   He

180—33

also owned valuable farming lands. The title of some of his property was in litigation and the possession of some of it was held by adverse claimants. He was largely indebted, both on his personal account and as surety for the Globe and Firemen's insurance companies, both of which had failed and were in the hands of receivers. His income-producing city property, and also his homestead, was encumbered by mortgages, and the vacant city lots and acre property was in like condition, so far as loans could be obtained upon it. A portion of his farming land was encumbered by mortgages and other portions were covered by a decree rendered against him in litigation growing out of his connection with the said insurance companies. His indebtedness which was secured by mortgages approximated $600,000, and other demands against him would swell the total of his indebtedness to an aggregate of three-quarters of a million of dollars. He testified that his annual interest charge was $47,000, his tax bills about $25,000, and the annual expenses in the way of repairing his buildings was between $15,000 and $17,000, and that his income did not equal his expenditures; that there was a yearly deficit, and that his indebtedness had steadily increased during these later years; that the deficit, though in part met by sales of property and by loans made of one person to pay a debt to another, had continually swelled the total of his indebtedness; that his checks had been frequently thrown out by the banks, and that his condition was such he was unable to negotiate further loans upon his property; that judgments at law had been rendered against him which he was not able to satisfy and executions were outstanding; that of his indebtedness which was secured by mortgages one-quarter of a million of dollars had fallen due or been declared due because of failure to pay interest, and foreclosure was threatened; that he had made partial payments of the interest and was endeavoring to obtain money to pay the remainder and avoid foreclosure;

that since the proof was taken in 1894 the salable and rental value of his property had greatly depreciated; that a list.of rents derived from his farm property, which was exhibited to the court and the items of which were sworn to be correct, showed that farm rents for 1896 were less than one-fifth of the amount which he received from the same property in prior years; that most of his city buildings were old and that tenants preferred more modern buildings; that he had a great many vacancies, as many as twenty buildings being then vacant; that he had to accept lower rents and expend more in repairs from year to year, and that he was unable to pay all the taxes due in the year 1895 for 1894, the delinquencies being about $4000; that taxes due in the year 1896 for the year 1895 he could not liquidate, and that his property in 1896 was sold or forfeited to the State for taxes amounting to $18,353; that he exercised strict economy and has limited his personal expenses, including all cost of living, to $100 per month; that he had not diverted any of his property or income, or proceeds thereof, to any other purpose than that of endeavoring to save his estate; that since 1894 he has devoted his time and his utmost attention to the management of his business affairs, even to the injury of his health, and that it was his deliberate belief his financial situation threatened ruin to his entire estate. The son testified at length as to the condition and management of the estate, and presented written statements showing in detail the transactions. His testimony corroborated the statements of the father.

The appellee testified that for a year and a half after May, 1893, appellant paid her on her preliminary alimony about $300 per month "pretty regularly," but since then the payments have been irregular and unsatisfactory; that since then he began making payments in smaller checks, often dated for payment in the future; that payment was frequently refused by the banks; that at different times she had left the checks at the bank until

advised the funds were there to meet them; that she has waited for as much as twenty minutes for the clerks at the bank to ascertain whether there were sufficient funds to meet the checks, and sometimes had to go away without the money and call again when advised the appellant's account was such as to meet the check; that she finally succeeded in collecting all the checks which he had given her except one for $100 she held, which was dated ahead for payment. It was proven by other testimony the appellant had made numerous applications for loans on his already mortgaged property and such other as was not encumbered. The testimony of the witnesses produced by the appellee to testify as to the general financial conditions was, in the main, to the effect that possibly money matters were slightly easier than a few months before, though there was a contrariety of opinion on that point, but upon cross-examination their testimony, in substance, was, that applications for loans were very strictly scrutinized; that there was a disposition to avoid accepting as security property that was not modern in build and equipments and was vacant or could only be partially tenanted, and that the financial condition of the proposed borrower was an element that was also considered; that it would be very difficult to negotiate loans upon property not modern in its equipments if the owner was in default of the payment of interest on other loans or in the payment of taxes and was involved in litigation.

The appellant estimated the reasonable value of his property at $1,000,000, or about $250,000 above his indebtedness, though he insisted that in the present condition of business depression such values were nominal, only, as that sales could only be effected at great sacrifice. The master, in his report, gave expression to his conclusions upon this point in the following language: "It is doubtless true that at the present time the property referred to would be unsalable at the prices men-

tioned by the defendant or at any reasonable price, and it is also certain that just at the period referred to by the defendant in his testimony the property in question could not be rented as advantageously as in former years, but that it can be rented as well as may reasonably be expected when the effects of the present great business depression have disappeared." Counsel for appellee contend $2,500,000 is a conservative estimate of appellant's estate in gross. This conclusion is reached mainly by way of the assumption that the annual taxes represent three-fourths of one per cent of the value of the property, and by arguments resting on the value and income current in former years,—the year in which the World's Fair was in progress and prosperous years immediately preceding that period,—the testimony which we find in the record which furnished a substantial basis for estimates of present values and present income being, in effect, ignored.

Counsel for appellee argue the court should proceed upon the basis the gross annual income of the appellant is from $80,000 to $100,000. It cannot be contended there is evidence to justify this conclusion. In reaching it the evidence as to the actual amount received from the rents of the real estate is not deemed by counsel a proper measure of the income of such property. Counsel for appellee say: "A very considerable part of defendant's property is vacant and unimproved. He has seen fit to leave a considerable part of his estate invested in that kind of property. The actual income, then, from his improved property is not a test of his potential income, which should be taken into consideration. He is not to escape the payment of a fair allowance to the complainant from his estate because he finds that in the prospective increase in value of vacant and unimproved property he will get an equivalent, or more than an equivalent, for the income upon the value of the property if the amount of such value were fairly invested in income-bearing prop-

erty or investments, and we submit that five per cent of such value is a fair and low measure of the potential net income of such estate. But if it should be regarded that four per cent of the value of his property should be taken as a fair measure of his net potential income, this would amount, on the basis of a valuation of $2,500,000, to $100,000 per year; on the basis of a valuation of $2,000,000 to $80,000 per year."

This argument had great weight with the master, and induced him to estimate the income of the appellant from the consideration of what others might think the estate, if differently managed, might be made to produce on the return of anticipated, or at least hoped-for, general prosperity. The course of reasoning which led the master to act upon what is denominated the "potential" income of the appellant's estate rather than upon the real income thereof, as developed by the testimony, is indicated by the following excerpts from the master's report: "The complainant's solicitors also insist that it is proper to consider the faculties of the defendant, or the sources from which the separate maintenance may be derived, and not only his actual income as testified to by himself or other witnesses, but his potential income, or such income as may be obtained under reasonable conditions or natural expectations; also, that in establishing the amount of the separate maintenance the complainant is entitled to compensation for her physical and mental suffering, and for the loss of the society of her husband, and of the associations of the family home now lost to her. The faculties of the defendant are necessarily considered in this case, for the reason that so large a portion of the estate described by the witnesses who testified on behalf of the defendant is still unimproved and produces no income. A considerable portion of this unimproved property appears to be so situated that if judiciously built upon it might produce a very good return for the investments made thereon. The record shows that the

defendant has exercised good judgment in the buildings he has erected, and that his management has been very thrifty and economical. Therefore it is reasonable to believe that with the return of general prosperity the actual income that the defendant's testimony discloses will be greatly increased, and the productiveness of the estate be made to approach more nearly to its possible or potential income. The good management shown by the defendant, George F. Harding, in the acquisition of such an extensive list of property would, if continued and directed to the improvement thereof, soon place it in a condition to yield a very much larger income than that fixed by any of the witnesses in this proceeding. Therefore it becomes proper and equitable in this proceeding to consider as the potential income of the defendant an amount much larger than the present actual income of his estate for the purpose of fixing the amount to be awarded by this court to complainant for her separate maintenance."

The weakness of this argument, in one respect, is, that it unmistakably appears from the testimony there has been no increase in the value of vacant and unoccupied property, but, upon the contrary, great shrinkage in such values. Argument is certainly unnecessary to refute the proposition that an investment in vacant and unimproved property which has proved a losing venture as to the capital invested, and which has greatly depreciated in price and is still depreciating, and which has produced nothing, constitutes a source of income to the investor. Furthermore, in view of the fact it is unmistakably disclosed by the evidence many of the appellant's buildings, apartments and flats are vacant, and that there is much other similar unrented property in Chicago, and that tenants have only been secured for many of his other buildings by great reductions in rental prices and donations of rents for short periods, and other expedients, it would be manifestly unjustifiable to estimate the

income of the appellant upon the theory that it might be made larger than it is by the construction of still more buildings, apartments and flats. The demand is not for more tenements, but for more tenants to occupy buildings, rooms and apartments already constructed and standing vacant and unoccupied. We are concerned with the actual and real situation, and not with mere theories and enthusiastic anticipations. As illustrative of the effort to overcome the facts and details appearing in the proof relative to the income-producing value of appellant's property by wholly insignificant circumstances, we may instance the following suggestion of counsel for appellee in their brief: "That his income was $100,000 per year is a fair inference from a letter" written by a relative, "wherein he refers to him (appellant) argumentatively as a man with an income of $100,000 per year." It appeared the conclusion reached by the master, based upon the prospective potential or anticipated income of the appellant, was that the appellee should be awarded permanent alimony in the sum of $5000 per year, and that counsel for appellee insisted that the bad conduct or *delictum* of the appellant should operate to increase her allowance, and that, after hearing argument upon the question, he adopted the views so urged by counsel for appellee and added $3000 per annum to the amount previously determined upon by him, and recommended the sum of $8000 per annum be decreed to be paid to appellee, $3000 thereof being awarded "on account of the *delictum* of the defendant" (appellant). The chancellor, upon consideration of the master's report, reduced the proposed permanent annual alimony to $6400.

The situation, as we believe it to be from the vast mass of testimony touching upon the point, is, that the appellant was in the more prosperous former years in the enjoyment of a net income of from $50,000 to $75,000 per year during different years; that the property which produced that income has depreciated very greatly in its

real value, and still more largely in its salable value and income-producing capacity; that his indebtedness has grown larger in its actual sum, and very much larger in comparison with his ability to discharge it out of the property mortgaged to secure it, or to pay interest upon it from the income of his property; that other investments have proved unprofitable and increased his actual indebtedness and involved him in litigation as to other large demands as surety; that he is threatened with foreclosure of mortgages against his property and sales thereunder; that he is burdened with interest demanded annually in a large sum in the aggregate, and called upon to pay heavy charges for repairs of his buildings, which increase yearly as the buildings grow older, and that his gross income has been materially reduced and his net income still more decreased in proportion; that judgments at law against him are unpaid and that he is unable to meet many demands admittedly just and due, and that his belief is justified that it is only by the exercise of economy, sound judgment and diligent attention in the management of his property and his affairs that he may avert financial ruin and extricate some fair proportion of his estate from that which threatens to absorb it all. The testimony of the appellee with relation to the manner in which payments of temporary alimony have been made to her, and the course pursued by her in endeavoring to collect and secure payment of the numerous small checks received from appellant; the fact she claims large arrearages of preliminary alimony are unpaid, and that by reason of the default in such payment she has been required to devote her own means to her support, and yet did not seek to enforce payment by attachment for contempt for a number of years, is consistent with the view the appellant has been and is in financial distress and pressed to secure ready money to meet demands against him, and that appellee knew such to be the real situation of his affairs. Though living separate and apart from him, the

appellee retains the legal rights and interests, present and prospective, of a wife in his property. Her interest is allied with his in everything that tends to rescue his property from the dangers with which it is now encompassed. A just and proper determination of his abilities and faculties is a matter not only of present but of future concern and importance to her. His success in the struggle to save his estate is her reliance for the payment of whatever may be awarded her for alimony and also as to her prospective interest in his property.

Our statute expressly requires that permanent alimony shall be determined with reference to the condition of the parties in life and the circumstances of the respective cases. (Hurd's Stat. 1897, par. 22, chap. 69, entitled "Husband and Wife.") The faculties of the husband; the property, and ability of the husband to pay the amount awarded; the income of both the husband and wife, and from what source the wealth came; the age and ability of each; the conduct of the one who has offended—and of both the parties, for that matter; the nature of the situation of the estate of the husband and the amount which the condition of the affairs of the husband will enable him to pay without impairing his business, may be considered by the court. (1 Am. & Eng. Ency. of Law, 480, 481.) Alimony will be granted in proportion to the wants of the wife and the circumstances of the husband who is to pay it. (*Foote* v. *Foote*, 22 Ill. 425.) It is undoubtedly the rule, where there is no income and the payment of the allowance will diminish the estate from which the income is derived it will not ordinarily be permitted to extend beyond providing for the actual wants and necessities of the wife. (*Harding* v. *Harding*, 144 Ill. 588.) Where alimony is granted without a divorce, it may be increased or diminished by subsequent decree, if a change in the circumstances of the parties warrants such course, (*Cole* v. *Cole*, 142 Ill. 19; 1 Am. & Eng. Ency. of Law, 481;) and our statute expressly authorizes such subsequent changes

in case of divorce. (Chap. 40, sec. 18.) The effect of the allowance upon the business affairs of the husband may be of the utmost importance, not only to the husband, but, in view of the fact the allowance to be fixed may be changed if the financial condition of the husband improves, the appellee is interested in all that favorably or unfavorably affects his estate.

The appellee was allowed $300 per month temporary alimony by a decree entered July 1, 1890. She has not sought to have the allowance increased, and seems to have fully recognized that it was not infrequently quite difficult for the appellant to provide that sum. In passing on an application of appellee to enforce payment of this alimony the court found he had paid something more than $13,000 as temporary alimony and was still liable to pay appellee $11,716 under the order of July 1, 1890, and entered a decree requiring payment of the latter sum to be made. This decree is before us in conjunction with this cause, and has been found to be correct and will be affirmed in a separate opinion. The chancellor in the cause decreed the mother was entitled to the custody of the daughters from the date of filing the bill until they arrived at age, respectively, and decreed the appellant should pay appellee $8156.61 to reimburse to her the amounts expended by her in the past support of said daughters. This finding and decree we have herein affirmed. Appellant contends appellee, when she filed the bill, had possession of from $20,000 to $30,000 which she obtained from him. The exact amount may be questioned, but that all amounts expended by her in supporting the children were obtained by appellee from her husband cannot be doubted. He will therefore be required by this decree and the decree in the other cause to pay her, in the way of balance of temporary alimony unpaid and to reimburse her for expenditures for the daughters, in the aggregate more than $19,000. Her indebtedness, as we gather it from her testimony, does

not exceed $1500. The payment of these large sums so awarded to the appellee will add to the already heavy financial burdens of the appellant and swell the sum of an indebtedness now alarmingly great. A thorough investigation of all the facts disclosed by the record, and much reflection thereon, impels us to the conclusion an allowance of the additional sum of $6400 per annum as alimony for the appellee is not justified by the present value and net income-producing capacity of the estate of the appellant, is not necessary for the reasonable support and maintenance of the appellee, and ought not, at least for the present, be required to be paid by the appellant. Future developments may make such sum, or even a larger amount, reasonable and proper, and if so, power rests in the court to increase the allowance. The appellee was granted $300 per month as temporary alimony when the value of the estate and the annual income thereof were much greater than now, and it does not appear she has complained that that sum was insufficient. We think, in view of all that has been said, no more than that amount should have been required by the chancellor to be paid by the appellant.

The decree in this respect will be modified by reducing the amount to be paid the appellee, until the further order of the court, to the sum of $3600 per annum, to be paid in monthly installments of $300. It is also ordered the decree to be rendered in pursuance of this opinion shall provide that such alteration in the allowance for alimony may be made by future decree or decrees as shall or may be found to be just and reasonable. The costs in this court will be paid by the appellant.

The decree of the circuit court and the judgment of the Appellate Court are affirmed except as herein ordered, and in that respect are reversed. The cause will be remanded to the circuit court, with directions to enter a decree in conformity with this opinion.

*Affirmed in part and remanded.*

Mr. JUSTICE MAGRUDER, dissenting:

I think that the judgment of the Appellate Court ought to be affirmed as to the allowance of $6400 for alimony, as well as in the other particulars mentioned; and upon this subject I refer to and adopt the following views of the Appellate Court as expressed in paragraph 11 of its opinion, which is omitted from the opinion as above quoted:

"*Eleventh*—A full and careful consideration of the evidence bearing upon the amount of appellant's property, his income therefrom, his circumstances and situation generally, the appellee's separate property, social position, health and circumstances, the general family history and manner of life of the parties prior to and since their separation, aside from the *delictum* of appellant as disclosed by the evidence, has led us to the conclusion that the decree of the chancellor in awarding appellee $6400 per annum as permanent alimony should not be reversed. The evidence is conflicting in many respects, and we are unable to say that the finding of the chancellor is manifestly wrong. The court saw many of the witnesses on the trial, and his findings should not be disturbed unless they are clearly and manifestly against the evidence. *Delaney* v. *Delaney*, 175 Ill. 187.

"This principle may also be properly applied to all the other issues in the case on which the evidence is conflicting. Anything like a comprehensive review of the evidence bearing on this finding would require an enormous amount of labor, which could prove of little or no benefit. It seems sufficient to say that, in our opinion, the chancellor would have been justified in finding from it that at the time of the hearing, in January and February, 1897, appellant was worth, over and above all his debts, an amount not less than $500,000, or even $1,000,000, and that he had a gross annual income from his property of at least $80,000 and a net income of $15,000 annually. A very important consideration in this regard is the fact

that while appellant insisted that at the time of the hearing before the master in 1897 he had no net income, he declined to produce his books of account for examination. Also, in this connection, as well as with reference to all other matters in which the weight of appellant's testimony is important, it may not be amiss to consider the fact, which appears from the record in case No. 7765 of this court, between the same parties, which was by agreement heard with this case and in which the record in this case was to be considered so far as material, that appellant, on August 31, 1897, filed a bill for divorce, sworn to by him, against appellee, in the superior court of the county of SanDiego, in the State of California, in which he alleges, among other things, that in the month of February, 1890, appellee willfully and without just cause deserted and abandoned him, and ever since has been and still continues so to willfully and without just cause desert and abandon him and to live separate and apart from him without any sufficient cause or reason. This sworn statement of appellant, when considered in connection with appellant's stipulation and the evidence in the case, we think tends strongly to support the conclusions of the master and the court; but it is unnecessary to, and we do not, base our conclusions in affirming the circuit court upon this statement, since it was made after the decree in this cause. If the matter of appellant's *delictum* were to be considered, which we have seen was an entirely proper matter for consideration, then there is a much stronger basis of support for the decree in this respect. The master considered appellant's *delictum* (both cruelty and adultery) in arriving at his conclusions, but the chancellor has certified that he did not consider or pass upon the question of adultery, because he regarded it as unnecessary in view of appellant's stipulation of January 3, 1893, although the master found facts which practically show that appellant was guilty of cruelty to appellee as well as of adultery with Mrs. A. R. Louis,

and the decree approves the master's findings except as to the amount of alimony and the amount of the allowance for the minor children.

"It is contended by appellant that the proof did not sustain the findings of the master; that it failed to show appellant was guilty of adultery with Mrs. Louis, and, therefore, for this reason it could not form an element in fixing the amount of appellee's alimony. However this contention may be as to the adultery, which we do not decide because the chancellor did not, the fact remains that appellee, upon appellant's admission in open court, lived separate and apart from appellant without her fault. This can on this record only be referred to appellant's cruelty, if he was not guilty of adultery, and that must have been the conclusion of the chancellor."