Anna Mae Hoover, Appellant, v. Adrian Leslie Hoover, Appellee.

**Gen. No. 41,477.**

Opinion filed December 30, 1940.

SCHNACKENBERG, HANSEN & TOWLE, of Chicago, for appellant; ELMER J. SCHNACKENBERG, of counsel.

EDWARD S. KING, of Chicago, for appellee; LEO O. McCABE, of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Under a seperate maintenance decree entered October 21, 1927, finding that defendant had committed adultery with one Maye T. Hanley as charged in the bill, the court awarded plaintiff for her support $200 a month until the further order of the court. This

sum was regularly paid by defendant, until, pursuant to a petition filed by him March 26, 1940, the monthly payments were reduced. After defendant had filed his petition seeking to reduce the amount of the monthly payments plaintiff filed her petition asking for an increase in the amount awarded her under the original decree and both matters were heard at the same time. After a full hearing the court reduced defendant's payments to $100 a month, commencing April 1, 1940, and plaintiff's petition for an increase was denied. From this order plaintiff appeals.

The parties were married in 1914 and separated in 1925. Their only child, Mary Jane, was born in 1920 and became of age in 1938. The union was apparently a happy one until November, 1925, when plaintiff discovered her husband and Miss Hanley in bed in the Statler Hotel at Detroit, Michigan, in the early morning of November 22, 1925, both of them clad in night attire. Upon the hearing of plaintiff's bill for separate maintenance she advised the court that she was willing to live again with defendant, but he refused to resume the marital relationship. Because of her religious views she did not want a divorce, even though a prior chancellor, before whom the case was tried, sought to induce her to take a divorce instead of a decree for separate maintenance.

The decree entered in 1927 recites that defendant refused to offer any evidence, that defendant on November 22, 1925, committed adultery with Maye T. Hanley, that since that date plaintiff had been living separate and apart from defendant without her fault, and the court awarded $200 a month ''for the complainant for alimony and support,'' placed the custody of the child with the mother and gave the father the privilege of visiting his daughter at all reasonable times.

Defendant, who is about 50 years of age, has been a practicing attorney in Chicago for more than 20 years,

and since 1924 has been associated with the law firm of Kirkland, Fleming, Green, Martin & Ellis. His earnings, including a drawing account and bonuses for the years 1924 to 1940 inclusive were as follows: 1924—$5,000; 1925—$6,500; 1926—$8,000; 1927—$9,000; 1928—$10,000; 1929—$11,000; 1930—$12,000; 1931—$14,000; 1932—$21,000; 1933—$14,650; 1934—$17,600; 1935—$15,250; 1936—$16,000; 1937—$14,000; 1938—$15,000; 1939—$14,000; for the months of January, February and March 1940—$3,499.98. From 1931 to 1940 inclusive his drawing accounts were substantially $14,000 a year. These sums were supplemented by bonuses paid him from 1932 to 1938, which considerably enhanced his aggregate income during those years. His total receipts from 1927 through March, 1940, amounted to $187,000.

At the time of the hearing in 1940, defendant had on deposit in several Chicago banks the aggregate sum of $22,548.36. His safe-deposit box contained some certificates of deposit for bonds, several shares of Swift International stock and his insurance policies, of which there were four in number, aggregating $35,000. Three of these policies designate Miss Hanley as beneficiary, if living, and if not living, then his daughter, Mary Jane. A $20,000 policy calls for monthly payments to defendant, if he is living in 1949. The fourth policy for $10,000, named as beneficiary of an educational fund his daughter, Mary Jane, or in case of her death, Miss Hanley. The total cash surrender value of these policies on June 24, 1940, was $11,629.40. It further appears that defendant owns an one-half interest in vacant property in Hollywood, Florida, upon which the taxes are paid and for which he paid $2,500 in 1925, and a new automobile priced at about $1,200.

In 1933 defendant bought three lots fronting on Lake Michigan, at Long Beach, near Michigan City, Indiana, for which he paid $3,600. Afterward he erected on this property a seven-room residence with

furnace heat at a cost of approximately $10,000. Title to the property is in Miss Hanley. Over the garage entrance there is affixed the words "Ha-Hoo," consisting of the first two letters of "Hanley," and the first three letters of "Hoover." Miss Hanley testified that this home was a gift to her for the care and attention she had given defendant since 1925. The house is open for occupancy from the latter part of April until the end of October and Miss Hanley testified that she lived there with defendant whenever he was able to come out. Before the house was built defendant had rented a place in Long Beach, Indiana, where he and Miss Hanley spent the week-ends together.

It appears from the evidence that Miss Hanley worked and maintained herself until 1932, but has been unemployed since then, and now has no visible means of support other than contributions by defendant. She has a safe-deposit box in her name, to which defendant has access under a power of attorney, but the record does not disclose the contents of the box. For eight years prior to April, 1940, she resided in an apartment at 6348 Kenwood avenue, consisting of four rooms. It is admitted that defendant paid the rent for this apartment at the rate of $50 a month. On the mail box appeared the names of Maye T. Hanley and Hoover. Miss Hanley moved from the apartment in April, 1940, at just about the time the petition for reduction of payments was instituted, and she now calls Long Beach her home. During the years that Miss Hanley lived on Kenwood avenue, defendant resided in the nearby Mayflower Hotel, at 6125 Kenwood avenue, and admitted visiting her in her apartment two or three times a week.

Defendant contended before the chancellor upon the hearing of his petition for the reduction of separate maintenance payments that he had severed his connection with Kirkland, Fleming, Green, Martin & El-

lis because of his health, which he said had never been "real good." He complained of stomach trouble and about eight years before the hearing was confined in Wesley Hospital with a nervous condition in his legs. To relieve this ailment he took physiotherapeutic treatments during the intervening years from one Folke Lindberg, who testified that defendant had come to his office once or twice a week for massage and heat treatments. When defendant returned from his vacation after Labor Day in 1939 he called on Dr. Ralph Brown, who could not find any organic ailment to explain defendant's nervous condition. After keeping defendant at a hospital for almost a week, Dr. Brown called Dr. Peter Bassoe, a nerve specialist, in consultation. Dr. Bassoe found no organic ailment, but from a conversation with defendant concluded that he was in a worried state of mind and felt himself incapable of attending to his practice. He had crying spells and seemed concerned about his law business and his marital difficulties. The ailment was characterized by Dr. Bassoe as "anxiety neurosis," and he was of opinion that defendant was not in condition to work as a lawyer and would be incapacitated as long as his marital difficulties continued to exist. Dr. Bassoe testified that a man living in a clandestine relationship with a woman not his wife would be subject to the condition known as anxiety neurosis. Dr. Brown did not testify at the hearing.

Shortly before Christmas 1939, when defendant was about to leave for Florida with Miss Hanley, he sent a letter to his daughter reading in part as follows: "I have accordingly turned over my personal affairs to Mr. Lewis E. Pennish, an attorney friend of mine of long standing, located at 110 S. Dearborn St. (telephone Andover 1900) and if you or your mother should care to get in touch with me while I am away, would suggest that you communicate with him." Defendant made no payments to plaintiff under the decree after

the one due January 1, 1940, except under compulsion of a rule to show cause issued in March, 1940. He did, however, continue to receive $1,166.66 a month from the firm with which he was associated for the months of January, February and March, 1940, and gave Miss Hanley her apartment rent of $50 a month for January to April, 1940, inclusive.

Defendant and Miss Hanley drove to West Palm Beach, Florida, late in December, 1939, and remained there until the early part of April, residing in a furnished house for which defendant paid $600 rent. He also paid all expenses of the trip, as well as living expenses at West Palm Beach.

After the foregoing letter was written to Mary Jane and after defendant and Miss Hanley had gone to Florida, Mr. Pennish on January 8, 1940, at his office gave plaintiff a check for the last maintenance payment and there had a conversation with her pertaining to her domestic difficulties with defendant. The court excluded the conversation between Pennish and Mrs. Hoover, and she assigns this as error. The gist of the conversation is embodied in an offer of proof made by her counsel upon the hearing and is to the effect that Pennish then advised her that defendant did not intend to keep up the payments any longer and desired to obtain a divorce. In response to her question as to what was to become of her plaintiff offered to prove that Mr. Pennish replied, "Well, I don't know. How do you know that he hasn't turned over all of his assets and property to Miss Hanley? I don't know, it might be he could pay as high as $7,500 if you would get a decree of divorce and release him from future obligations." In reply to this remark she advised Pennish that she had been a lifelong member of the Roman Catholic church which does not favor divorces. The objection of defendant's counsel to the admissibility of the conversation was that "there was nothing in the exhibit (the letter from defendant to his

daughter) to indicate an agency.'' We think it was error to exclude the conversation on this ground, since the letter evidently clothed Pennish with authority, he having been designated therein as ''an attorney friend of mine of long standing'' to whom defendant had ''accordingly turned over [his] personal affairs.'' There is no reasonable explanation why defendant should have turned over his personal affairs to his friend and attorney and suggested that Mary Jane or her mother might communicate with Mr. Pennish, except to invite a discussion of his personal affairs between Pennish and his wife. Having rejected the offer, we must assume that the court did not consider the evidence offered. It should have been considered, however, because it was competent and material to the contention made by plaintiff all through this proceeding that defendant's effort to have the payments reduced sprang from a plan to force a divorce upon her rather than from his inability to continue the $200 monthly payments for the reasons assigned.

Defendant had attended law school with Mr. Martin of the firm of Kirkland, Fleming, Green, Martin & Ellis, who was responsible for defendant's employment by the firm in 1924. In 1931 Hoover was assigned to the work of liquidating banks, which has recently slackened off, and it was his contention that his nervousness and illness and the slackening off of work in which he had specialized, resulted in his discharge. Plaintiff's counsel earnestly insist that the evidence fails to sustain the finding that Hoover had lost his position, but that the reasonable inferences to be drawn from the evidence point rather to the conclusion that there has been only a temporary severance of the relationship pending the outcome of this litigation. The evidence upon which this contention is based may be summarized as follows: The firm had granted defendant a leave of absence for his Florida trip. Shortly thereafter when pursuant to defendant's suggestion

plaintiff called at Pennish's office Mr. Martin came in during the conversation which ensued and it is argued that Pennish's negotiations with plaintiff were known to Mr. Martin. The firm continued to make monthly payments of $1,166.66 to defendant until April 1, 1940. The hearing on defendant's petition was set for April 19, 1940, but no member of the firm appeared in open court to support defendant's contention that his connection with the firm had been permanently severed. On the other hand, it appeared from defendant's own testimony that after his return from Florida April 15, 1940, Mr. Pennish delivered to him a letter from Mr. Martin which indicated that his status with the firm was "uncertain," and contained the suggestion that Mr. Martin would discuss it with defendant whenever he decided to come in and talk about it. Mr. Carl Krah, who has long been office manager of the firm, called as a witness on behalf of defendant, testified that Hoover was not then employed and that there was no arrangement for his re-employment. Although it was admitted that defendant had received the letter from Mr. Martin, Krah testified that he was unaware of any such letter having been written. He admitted, however, that Mr. Martin may have intimated that later on the firm would be glad to discuss the matter of re-employment with defendant.

The legal aspects of the case present no difficult problems. It may be conceded that the court has jurisdiction and authority to alter the provisions of a decree respecting payment for alimony or separate maintenance, where a change in the circumstances or conditions of either party so requires. The law is also well established that the alteration of an order respecting payments rests in the sound judicial discretion of the trial court, and unless the record shows an abuse of that discretion such an order will generally not be disturbed on review.

Defendant seeks to justify the modification of the decree on two grounds: (1) that his physical condi-

tion has impaired his usefulness as an attorney and his discharge by the firm has cut off his income, with the result that the continued payment of $200 a month will diminish in a comparatively short time the principal of the estate from which income is derived, and exhaust the principal of his estate which should be preserved for the joint benefit of himself and his wife; and (2) that the allowance of $200 in the original decree was based upon the support of Mrs. Hoover and Mary Jane, and that since the latter has now become of age so that defendant is no longer legally obligated to support her, the sum of $100 a month is ample to provide for the actual wants of Mrs. Hoover. The only case cited in support of the first proposition is *Harding v. Harding*, 180 Ill. 481. That was a bitterly contested proceeding, wherein many questions of law and fact were at issue. One of the issues related to the propriety of an allowance made to Mrs. Harding and the court, in discussing this question, said (p. 522): "It is undoubtedly the rule, where there is no income and the payment of the allowance will diminish the estate from which the income is derived it will not ordinarily be permitted to extend *beyond providing for the actual wants and necessities of the wife.*" (Italics ours.)

It is argued that notwithstanding his loss of income as a practicing attorney he is nevertheless required by the modified order to pay the monthly sum of $100 for his wife's support and an additional like amount for his own living expenses, together with $125 a month as premiums on four insurance policies aggregating $35,000, and his counsel say it is quite apparent that the trial court fixed an amount to be paid by him which was equivalent to the reasonable value of the possible income of his estate, so as "to preserve it from depletion or consumption at too rapid a pace, for plaintiff's interest as well as defendant's." We have no quarrel with this theory of law where it has some pertinent application to the facts of the case, but

the record in this proceeding is replete with evidence indicating that for the past ten years or more defendant has given no thought to preserving his estate for the benefit of his wife or of her future welfare. While she had been living with her daughter in a three room kitchenette apartment, where it is impossible for either of them to retire at night when the other is entertaining company because of limited sleeping and living facilities, defendant purchased from the assets of his estate a $13,000 summer home which he has maintained for himself and Miss Hanley. In addition thereto he had his own living quarters and a four room apartment which he maintained for Miss Hanley in proximity to his own living quarters. He has paid from his income the premiums on the four insurance policies, designating Miss Hanley as beneficiary and making not even a contingent provision for his wife in the case of Miss Hanley's death. In 1939 he took Miss Hanley on a three month vacation to Florida, where the rental of a home, without considering any of the other expenses of the trip, amounted to $600. Some approximation of the total expenses of that trip may be gained from the fact that in December, 1939, he drew checks totaling $2,711.66 on one bank, and in January, 1940, withdrew from his account the sum of $1,180.41. It is undisputed that Miss Hanley has not been employed since 1932, and has no visible means of support or income, and, although there is no direct evidence of the fact, it may be inferred from the record that one of two contingencies exist: (1) either defendant is paying her living expenses and maintaining her on a considerably higher plane than his own wife out of his income or estate, or (2) she has sufficient income from possible assets in her safe-deposit box to which defendant has access to supplement expenses for her support which defendant has voluntarily assumed. The argument that "she is as much interested as he is in the preservation of his estate,"

is negatived by all the circumstances of this case; if the estate is being preserved at all, it is for the benefit of Miss Hanley and not Mrs. Hoover.

In the view that we take it is not necessary to determine whether defendant's career and earning power has been fully or permanently impaired, although there would seem to be considerable doubt that the usefulness of a man at the age of 50 who is suffering from nothing more than "anixiety neurosis," due to his clandestine relationship with another woman, would contemplate retirement as his counsel argue, or that the firm for whom he has rendered such valuable and important services for many years would permanently discharge him from its employment for such trivial reasons as he assigns. It may be that at some time in the distant future, if his earning capacity has in fact been totally impaired, a petition such as he has filed might fairly be entertained, but with approximately $35,000 or $40,000 in assets which can be readily liquidated, not including the summer home at Michigan City which Miss Hanley claims as her own, we think the court was utterly unwarranted in decreeing the reduction of his wife's maintenance.

Assuming that *Harding v. Harding,* 180 Ill. 481, reflects the correct rule of law in Illinois, the record made by plaintiff in opposition to defendant's motion shows that it would be extremely difficult for Mrs. Hoover, who has now reached the age of 53, to get along on less than she has been receiving; and even though there should be no income or an insufficient income from defendant's estate the continuance of the $200 monthly payments will not diminish the estate "beyond providing for the actual wants and necessities of the wife." (*Harding v. Harding.*) Mrs. Hoover testified that her rental amounts to $50 a month. She does her own housework. Her telephone, gas, electricity and fire insurance approximate $15 a month. She testified that in spite of the fact that she wears

her clothes "from one year to the other," and fixes them herself, they cost her about $10 or $11 a month. She has for a long period had sinus infection, resulting in arthritis which has crippled her fingers, her arm and her back. This has made it difficult for her to hold objects while working and has rendered her left hand useless for any gainful service. As a result of this ailment she has been constantly taking treatments from a physician to whom she has paid approximately $20 a month in addition to medicine which costs her $10 a month. Her physician thought that the arthritis may have been caused by her teeth and accordingly she has taken treatments for pyorrhea, and in addition thereto had a partial plate made in October, 1939, for which she paid $150. She incurs some expenses for moderate entertainment—lectures and moving picture theatres. Her furniture and rugs have required repair and replacement from time to time, and her personal expenses, such as carfare, hair dressing, storage and insurance for her fur coat, which is ten years old, and many other necessary and incidental expenses, aside from her grocery bills, which run to approximately $50 a month, total well over $200. Since the modified order has been in effect she has found it necessary to borrow $700 from relatives—$500 from her brother, William Summers, and $200 from her sister, Mrs. Higgins. None of this evidence is in dispute, and although defendant's counsel cross-examined Mrs. Hoover quite extensively, it is apparent from the evidence that her actual wants and necessities require at least the sum provided for in the original decree.

The second contention that the allowance of $200 in the original decree was provided for the maintenance of Mrs. Hoover and the support of Mary Jane is not supported by the record. The chancellor who originally heard the case [and not the court who entered the modifying decree] severely criticized Mrs. Hoover for invoking the separate maintenance statute and re-

fusing to accept a divorce, and although defendant offered no evidence by way of defense to the original bill the court held up the entry of the decree for about seven months, and when it was finally entered he awarded Mrs. Hoover $200 a month ''for the complainant for alimony and support.'' No mention is made of Mary Jane, except that she was placed in the custody of her mother, and although defendant introduced the original certificate of evidence upon which the decree was predicated in an attempt to show that the support of Mary Jane was included in the $200 award, the decree which the court had under advisement for seven months is silent on the subject. Under the established law of this State the support of minor children has always been regarded the natural obligation of both parents. At common law the father was held to be the one primarily responsible for the support of his children. Since the emancipation of the wife by law, however, she is held legally responsible for the support of their minor children equally with her husband (*Purity Baking Co. v. Industrial Commission,* 334 Ill. 586), and the duty of a father to support his minor child exists and can be enforced, even by the people, despite the existence of an adverse decree awarding the custody of the child to the mother, where the decree makes no provision for the payment of any sum for the support of the child. (*Steele v. People,* 88 Ill. App. 186.) With the exception of some minor gratuities at Christmas time, on birthdays and other occasions, and payment of Mary Jane's tuition at school, the burden of supporting and raising Mary Jane has fallen entirely on Mrs. Hoover. Defendant has not even availed himself of his right to visit his daughter, and during the eight or nine years preceding the filing of the petition had seen her only once, and that was an accidental meeting at a funeral which she attended with her mother. When the original decree was entered defendant was earning only about

$9,000 a year, and the sum of $200 a month was predicated on that amount. In subsequent years his earnings rapidly increased and although in the last ten years Mrs. Hoover would have been amply justified in applying for an increase in her allowance she struggled along on approximately one seventh of defendant's income for herself and Mary Jane. During these years she has adjusted herself to a monthly income of $200, with considerable hardship, and it would be a strange doctrine indeed that would justify a court· in cutting that income in half upon so flimsy a showing as is indicated by the circumstances of this case.

Defendant cites several cases in support of his contention that the allowance of alimony and the modification of separate maintenance and alimony orders rests in the sound judicial discretion of the court. This is undoubtedly the law, but in every case that has been called to our attention the courts say that the doctrine must be exercised in view of the nature and conditions of the case. This record shows no justification for the modification order, and without departing from the well-established doctrine for which defendant contends, we feel convinced after a careful examination of the record that the modification order should not have been entered.

We have indicated that under the undisputed facts in the case Mrs. Hoover has had difficulty in getting along on $200 a month, and although defendant's earnings during the last ten years would clearly have warranted a substantial increase, we feel constrained to deny the increase at this time in view of his contention that he is unemployed. If it should later develop that he resumes his relationship with the firm, or derives a substantial income from his profession from some other source Mrs. Hoover should feel at liberty to renew her application.

In the light of these conclusions we are of opinion that the order of the superior court appealed from

should be reversed and that the cause should be remanded, with directions to enter an order vacating the modification of the decree and allowing plaintiff to receive maintenance payments as heretofore provided in the original decree.

*Order reversed and cause remanded with directions.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.